UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WILLIAM S. TIDWELL,<br><br>Defendant | Criminal No. 23cr10193<br><br>Violations:<br><br>Count One: Receipt of Payments in Violation of Official Duties<br>(18 U.S.C. § 201(b)(2)(C))<br><br>Count Two: False Statements to a Bank<br>(18 U.S.C. § 1014)<br><br>Count Three: Identity Theft<br>(18 U.S.C. § 1028(a)(7))<br><br>Forfeiture Allegation:<br>(18 U.S.C. §§ 981(a)(1)(C), 982(a)(2), and 28 U.S.C. § 2461) |

## INFORMATION

The United States Attorney charges:

### General Allegations

At all times relevant to this Information:

1. Defendant WILLIAM S. TIDWELL was an employee of the Federal Bureau of Prisons ("BOP").

2. The BOP is an agency of the United States under the U.S. Department of Justice. The BOP is charged with the management and regulation of federal penal and correctional institutions. The BOP's responsibilities include the care, custody, and control of incarcerated individuals who have committed federal crimes.

3. In approximately April 2000, TIDWELL began his employment with the BOP. TIDWELL was originally hired to work at the Federal Correctional Institute in Forrest City,

Arkansas ("FCI Forrest City").  From approximately April 2000 through approximately April 2008, TIDWELL worked at FCI Forrest City in a variety of positions.

4. In approximately April 2008, TIDWELL transferred from FCI Forrest City to the Federal Medical Center Devens in Massachusetts ("FMC Devens").  From approximately April 2008 through the present, TIDWELL has remained a BOP employee assigned to FMC Devens.

5. FMC Devens is a federal prison located in Ayer, Massachusetts.  FMC Devens primarily houses male inmates requiring specialized or long-term medical care.  It is designated as an administrative facility, which means it houses inmates from different security classifications.

6. "Individual 1" was an ultra-high net worth individual serving time in federal custody for committing various financial crimes.  Individual 1's crimes of conviction took place in another jurisdiction, but he had been designated to serve his federal sentence at FMC Devens.

7. "Individual 2 was a close friend and business associate of Individual 1.  While Individual 1 was imprisoned at FMC Devens, Individual 2 was Individual 1's most frequent contact.

8. Individual 2 operated a Limited Liability Company (the "LLC"), generally at the direction of Individual 1, that purchased approximately a dozen properties in the Worcester, Massachusetts area worth millions of dollars.

9. The "Tidwell Family Member" was a close family member of TIDWELL.

<u>The Duties and Standards of Conduct of a BOP Employee</u>

10. Given the BOP's important role in providing for the care, custody, and control of federal inmates, the BOP has implemented various "program statements" and policies that govern the duties and conduct of its employees.  These program statements include the BOP Standards of Employee Conduct ("BOP Standards Manual"), which outlines a BOP employee's duties and

responsibilities, especially in matters involving ethics and conflicts of interest. The BOP Standards Manual builds on federal regulations regarding ethics and conflicts of interest, including 5 C.F.R. Part 2635 ("Standards of Ethical Conduct for Employees of the Executive Branch"), which also applies to BOP employees.

11. At all times during his employment with the BOP, TIDWELL's duties and conduct were governed by the BOP's program statements and policies. BOP employees receive periodic trainings regarding their duties and responsibilities. On multiple occasions, TIDWELL was provided—and acknowledged that he received—BOP's program statements and policies governing his duties and conduct.

12. TIDWELL received the BOP Standards Manual at both FCI Forrest City and FMC Devens, including the current version of the BOP Standards Manual, which is also known as Program Statement #3420.11. For example, in December 2013, while at FMC Devens, TIDWELL signed an "Acknowledgement of Receipt of Standards of Employee Conduct" stating that "I, William Tidwell, hereby acknowledge receipt of Program Statement #3420.11. I further acknowledge that my conduct is governed by this policy and it is my responsibility to familiarize myself with the provisions of this document."

13. In outlining a BOP employee's duties, the BOP Standards Manual makes clear that "Employees must … endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards promulgated in this policy and the statutes." It further states that "Employees must … avoid conflicts of interest in matters that affect their financial interests."

14. Given the critical role played by the BOP and its employees in caring for inmates and providing for safety at correctional facilities, the BOP Standards Manual contains specific guidance on how employees should conduct themselves in the performance of their duties,

3

outlining certain "types of behavior [that] cannot be tolerated in the Bureau." Among other things, in the performance of their duties, employees like TIDWELL must not show partiality towards any inmate, or become financially or physically involved with any inmates or family members or close friends of any inmates. As explicitly stated in the BOP Standards Manual:

> Employees may not allow themselves to show partiality toward, or become emotionally, physically, sexually, or financially involved with inmates, former inmates, or persons known (or who should have been known based on circumstances) to the employee as a family member or close friend of inmates or former inmates.

15. Similarly, the BOP Standards Manual also makes clear that employees like TIDWELL may not give or receive any gifts or personal favors from an inmate or someone known to be associated with an inmate. Importantly, employees like TIDWELL may not show favoritism or give preferential treatment to any inmate in the performance of their official duties. As expressly stated in the Personal Conduct section of the BOP Standards Manual:

> An employee may not offer or give to an inmate or a former inmate or any member of his/her family, or to any person known to be associated with an inmate or former inmate, any article, favor, or service that is not authorized in the performance of the employee's duties.
>
> Neither shall an employee accept any gift, personal service, or favor from an inmate or former inmate, or from anyone known to be associated with or related to an inmate or former inmate. This prohibition includes becoming involved with families or associates of inmates.
>
> An employee may not show favoritism or give preferential treatment to one inmate, or a group of inmates, over another.

16. To further prevent conflicts of interest and to further ensure that BOP employees fairly and adequately perform their duties, the BOP Standards Manual also contains a general prohibition against outside employment. Specifically, the BOP Standards Manual states that "an employee may not engage in outside employment … that conflicts with his/her duties."

17. The BOP imposes these duties and requirements on its employees specifically to avoid conflicts of interest and to avoid situations where an employee's duties as a public servant affect, or are affected by, the employee's private interests. The BOP's requirements that employees not show partiality or favoritism toward inmates, not become financially or physically involved with inmates or those close to inmates, not receive gifts from inmates or those close to inmates, and not obtain outside employment without approval, all play a critical role in ensuring that the BOP can fulfil its correctional goals and operational objectives.

### TIDWELL's Role as a Correctional Counselor

18. In approximately October 2014, TIDWELL began working as a Correctional Counselor at FMC Devens, a position that gave him significant levels of contact with, and authority over, inmates. Correctional Counselors like TIDWELL have extensive day-to-day contact with inmates and the Correctional Counselor is considered the initial contact person for inmates confronting problems in the institution. Correctional Counselors also develop and implement programs at units within a BOP facility. As further described in the Position Description for the Correctional Counselor position, TIDWELL's major duties and responsibilities included:

- Assessing the interests and activities of inmates assigned to his caseload;
- Reviewing inmate requests for unit-based programming and coordinating with others to develop and implement inmate programs;
- Meeting regularly with inmates to address living skills and institutional adjustment concerns while incarcerated;
- Logging and distributing legal mail and coordinating inmate legal calls;
- Coordinating approvals and disapprovals of inmate visiting lists; and
- Monitoring and making changes to inmate work details and quarters.

19. While serving as a Correctional Counselor, TIDWELL was primarily assigned to the "P Unit" at FMC Devens, which is designated as the medical housing unit and is located within the prison hospital. As a Correctional Counselor, TIDWELL dealt with inmates on a daily basis and had a significant impact on the day-to-day activities of inmates. Among other things, TIDWELL had a significant role in monitoring and changing work assignments, monitoring and changing housing assignments, arranging legal calls, and coordinating prison visits for inmates.

<u>TIDWELL's Receipt of Benefits in Violation of His Official Duties</u>

20. Among the inmates supervised by TIDWELL in P Unit was Individual 1. Given his various health issues and medical needs, Individual 1 was assigned to stay at the P Unit at FMC Devens for significant parts of his prison sentence.

21. From approximately 2015 to approximately 2019, Individual 1 spent a significant percentage of his time in federal custody in the P Unit at FMC Devens. During those stretches in which Individual 1 was assigned to the P Unit at FMC Devens, TIDWELL was Individual 1's Correctional Counselor. As such, TIDWELL had significant control over Individual 1's day-to-day activities while in prison, including Individual 1's housing assignments, work details, legal calls, and prison visits.

22. Starting in at least approximately November 2018, TIDWELL developed an inappropriate relationship with Individual 1. Notwithstanding TIDWELL's significant supervisory authority and control over Individual 1's day-to-day activities as an inmate at FMC Devens, and notwithstanding TIDWELL's knowledge of BOP's rules and regulations that specifically (i) prohibited TIDWELL from receiving payments from an inmate or anyone closely associated with an inmate, (ii) prohibited TIDWELL from entering into any financial arrangements with an inmate or anyone closely associated with an inmate; (iii) prohibited TIDWELL from

6

entering into outside employment that conflicted with his duties, and (iv) prohibited TIDWELL from showing favoritism or partiality towards an inmate, TIDWELL's began receiving a stream of payments from Individual 1 and Individual 2.

23.     Specifically, in November 2018, TIDWELL and Individual 1 entered into an arrangement under which Individual 1, through Individual 2, paid TIDWELL $25,000 to, among other things, help pay off loans for the Tidwell Family Member. Part of this money to TIDWELL was used to pay off the Tidwell Family Member's loan that TIDWELL was also personally responsible for and had been previously making payments on.

24.     To facilitate this payment to TIDWELL, Individual 1 enlisted the help of Individual 2. To hide the source of this payment from Individual 1 to TIDWELL, Individual 2 called up the Tidwell Family Member, obtained the Tidwell Family Member's bank information, and then made two wire payments totaling $25,000 to the Tidwell Family Member from a business account managed by Individual 2. Specifically, Individual 2 wired the Tidwell Family Member $8,000 on November 29, 2018, and then another $17,000 on November 30, 2018. The Tidwell Family Member subsequently transferred $24,900 out of the $25,000 from her bank account to TIDWELL's bank account.

25.     At the time in late 2018 when TIDWELL began receiving a stream of benefits from Individual 1, he continued having a significant role over the day-to-day activities of Individual 1 as his Correctional Counselor in P Unit, including having a significant role in monitoring or changing Individual 1's housing assignments, arranging legal calls, and coordinating prison visits.

26.     During this time, P Unit, which was the designated medical housing unit at FMC Devens, was viewed as a coveted housing assignment because it allowed inmates to have access to a greater level of care and allowed for a greater level of privacy. For example, inmates were

often housed in single rooms based on medical needs. In contrast, "J Unit," viewed as more of the general population unit and where inmates generally went when released from P Unit, was a traditional, open-tier housing unit with 2-to-4-man cells. In October 2018, TIDWELL was informed on multiple occasions that medical personnel had cleared Individual 1 to be transferred from P Unit to J Unit, but TIDWELL delayed transferring Individual 1 to J Unit. Around this same time, TIDWELL entered into an arrangement with Individual 1 to receive approximately $25,000, which was wired to the Tidwell Family Member in November 2018.

27. TIDWELL never disclosed to the BOP that he received approximately $25,000 from Individual 1 in 2018—money that had been routed through Individual 2 and the Tidwell Family Member. TIDWELL's receipt of the approximately $25,000 from Individuals 1 and/or 2 violated numerous parts of the BOP Standards Manual. Among other things, TIDWELL violated his duty not to accept payments from an inmate or someone associated with an inmate; TIDWELL violated his duty not to enter into financial arrangements with an inmate or someone associated with an inmate; and TIDWELL violated his duty not to show favoritism towards any inmate.

28. TIDWELL's receipt of a stream of benefits from Individual 1, an inmate under TIDWELL's supervision, continued in 2019. In early 2019, TIDWELL and Individual 1 entered into a verbal agreement pursuant to which Individual 1 would direct thousands of dollars to TIDWELL as management fees for TIDWELL to manage property designated by Individual 1. This financial arrangement also used Individual 2 as the conduit through which TIDWELL received payments, although TIDWELL negotiated the core terms of the deal with Individual 1.

29. Starting in approximately 2019, Individual 2 began purchasing rental properties using the LLC. Starting in the second quarter of 2019, TIDWELL began receiving a series of payments described as "management fees" for his help in managing properties.

30. Between June 2019 and October 2020, TIDWELL received more than $47,000 in management fees from Individual 2 based on the financial arrangement TIDWELL had made with Individual 1, the inmate under his supervision when this scheme began in 2018.

31. In addition, starting in approximately August 2019, TIDWELL himself lived at one of the properties owned by Individual 2's corporate entity, resulting in another $18,000 in benefits to TIDWELL. In total, TIDWELL received over $65,000 in benefits from Individual 1 as part of this property management arrangement.

32. The real estate arrangement between TIDWELL and Individual 1/Individual 2 was not an arms-length transaction. TIDWELL was informed by Individual 2 that other property managers were being paid a net profit of 10% of the properties they were managing. However, based on the "handshake" deal between TIDWELL and Individual 1, Individual 2 was paying TIDWELL 50% of the net profit of the properties he was managing.

33. At the time TIDWELL entered into this real estate management agreement with Individual 1 and continued retaining the stream of benefits from Individual 1, TIDWELL retained his significant role over the day-to-day activities of Individual 1 as Individual 1's Correctional Counselor in P Unit, including having a significant role in things such as housing assignments, arranging legal calls, and coordinating prison visits. During this time, in return for payments, TIDWELL continued showing favoritism or partiality towards Individual 1 in violation of his official duties. In addition to not moving Individual 1 from the coveted P Unit at the earliest time that Individual 1 was eligible to be transferred from P Unit, TIDWELL allowed Individual 1 to set up legal calls more easily and with less notice than TIDWELL required of other inmates. TIDWELL also failed to appropriately monitor Individual 1's calls and emails.

34. Similar to the $25,000 payment he received from Individual 1 (routed through Individual 2 and Tidwell's Family Member), TIDWELL also failed to disclose to the BOP that he received approximately $65,000 as part of a real estate management deal with Individual 1.

35. The approximately $90,000 that TIDWELL received from Individual 1 (through Individual 2) as part of the aforementioned stream of benefits were accepted by TIDWELL in return for violating his official duties. Among other things, TIDWELL violated his duty not to accept payments from an inmate or someone associated with an inmate; TIDWELL violated his duty not to enter into financial arrangements with an inmate or someone associated with an inmate; TIDWELL violated his duty not to enter into any outside employment that might conflict with his duties; and TIDWELL violated his duty not to show favoritism towards an inmate.

### TIDWELL's False Statements to a Bank and Identity Theft

36. In 2020, after Individual 1 had been released from custody at FMC Devens, TIDWELL sought to purchase a home. In connection with a loan application for a property he was intending to buy, TIDWELL asked Individual 2 to give him a $50,000 loan to finance the sale of his new home.

37. As part of a loan application to Wells Fargo Bank, TIDWELL was asked to provide the source of the $50,000 he was using to purchase the home. Recognizing that he would not be approved if he disclosed that the $50,000 from Individual 2 was a loan he had to pay back, TIDWELL falsely told the bank that the $50,000 was a gift from his employer.

38. When the bank asked for proof of the gift, TIDWELL fraudulently created a letter which falsely stated that Individual 2's LLC had given TIDWELL a $50,000 gift towards the purchase of his home. To make this gift letter look more legitimate, TIDWELL forged or caused

to be forged the means of identification of Individual 2, including using Individual 2's name, address, and a forged signature.

39. Wells Fargo Bank subsequently asked TIDWELL to use the bank's own gift form instead of the gift letter he had submitted. TIDWELL then made additional false statements to the bank and engaged in further identity theft and fraud by forging or causing to be forged Individual 2's name and signature on the bank's gift form as well.

## COUNT ONE
Receipt of Payments by a Public Official in Violation of Official Duties
(18 U.S.C. § 201(b)(2)(C))

The United States Attorney charges:

40. The United States Attorney re-alleges and incorporates by reference paragraphs 1-39 of this Information.

41. From in or about November 2018 through in or about October 2020, in the District of Massachusetts, and elsewhere, the defendant,

WILLIAM S. TIDWELL,

a public official and employee of the Federal Bureau of Prisons, an agency of the United States, did, directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept something of value personally, that is, a stream of benefits of approximately $90,000, from Individual 1 and a person closely associated with Individual 1, in return for TIDWELL giving favorable and preferential treatment to an inmate, and entering into outside employment or financial arrangements with an inmate, in violation of the official duties of TIDWELL.

All in violation of Title 18, United States Code, Section 201(b)(2)(C).

## COUNT TWO
### False Statements to a Bank
### (18 U.S.C. § 1014)

The United States Attorney further charges:

42. The United States Attorney re-alleges and incorporates by reference paragraphs 1-39 of this Information.

43. On or about May 27, 2020, in the District of Massachusetts and elsewhere, the defendant,

### WILLIAM S. TIDWELL,

knowingly made a false statement and report, for the purpose of influencing in any way the action of the Wells Fargo Bank, the accounts of which are insured by the Federal Deposit Insurance Corporation, in connection with an application for a loan, in that TIDWELL falsely informed the bank that he had received a $50,000 gift from his employer to purchase a home, when in truth and in fact, as the defendant knew, he had borrowed $50,000 as a loan that he did not disclose and that he needed to repay.

All in violation of Title 18, United State Code, Section 1014.

COUNT THREE
Identity Theft
(18 U.S.C. § 1028(a)(7))

The United States Attorney further charges:

44. The United States Attorney re-alleges and incorporates by reference paragraphs 1-39 of this Information.

45. On or about May 27, 2020, in the District of Massachusetts and elsewhere, the defendant,

WILLIAM S. TIDWELL,

knowingly transferred, possessed, and used, in and affecting interstate commerce, without lawful authority, a means of identification of another person, to wit, the name and signature of Individual 2, knowing that the means of identification belonged to another actual person, with the intent to commit, or to aid and abet, any unlawful activity that constitutes a violation of federal law, to wit, the false statements to a bank in violation of 18 U.S.C. § 1014.

All in violation of Title 18, United State Code, Section 1028(a)(7).

**FORFEITURE ALLEGATION**
(18 U.S.C. §§ 981(a)(1)(C), 982(a)(2) and 28 U.S.C. § 2461(c))

46. Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 201(b)(2)(C), 1014, and 1028(a)(7), set forth in Count One through Three, the defendant,

WILLIAM S. TIDWELL,

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

47. If any of the property described in Paragraph 46, above, as being forfeitable pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b), both incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 46 above.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2), and Title 28, United States Code, Section 2461(c).

                                          Respectfully submitted,

                                          JOSHUA S. LEVY
                                          Acting United States Attorney

By:   /s/ Kunal Pasricha
                                          KUNAL PASRICHA
                                          MARK GRADY
                                          Assistant United States Attorneys
                                          District of Massachusetts