UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | No. 1:23-cr-10193-WGY |
| **WILLIAM S. TIDWELL,**<br>Defendant. | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant William Tidwell (Tidwell) by and through undersigned counsel, respectfully submits this memorandum in conjunction with his sentencing scheduled for December 7, 2023. Tidwell respectfully requests this Honorable Court impose a sentence of six (6) months incarceration followed by 2 yrs. Supervised Release, a $10,000 fine, and a $300 special assessment. In light of his full and complete acceptance of responsibility, his 23 service with the BOP, as well as other relevant factors and considerations under 18 USC §3553 (a), Tidwell respectfully submits that the sentence proposed herein is "sufficient, but not greater than necessary."

### PROCEDURAL HISTORY

Following lengthy negotiations, Tidwell agreed to waive indictment and plead guilty to an information pursuant to the terms of a plea agreement, both of which were filed on July 24, 2023. ECF#1, 3. The information charges Tidwell with one count of receipt of payments in violation of official duties, in violation of 18 U.S.C. § 201(b)(2)(C), one count of false statements to a bank, in violation of 18 U.S.C. § 1014, and one count of identity theft, in violation of 18 U.S.C. §

1

1028(a)(7). On September 6, 2023, Tidwell tendered a guilty plea to the information as agreed and has since been fully compliant with all terms and conditions of his release. *See* ECF#7-10.

No mandatory minimum sentence applies and the Court is not bound by the terms of the parties' agreement. Although Tidwell reserved the right to challenge the calculation of his guidelines sentencing range, he now agrees that they have been properly calculated with one exception.[1] There is no agreement as to sentence, however the government has agreed not to recommend a term of imprisonment greater than 24 months.

## ARGUMENT

I. **Applicable Law**

Under *United States v. Booker*, 543 U.S. 220, 259 (2005), the sentencing guidelines are no longer mandatory. The Sentencing Reform Act requires the Court to consider guidelines ranges, *see* 18 USC § 3553(a)(4), but permits it to tailor the sentence in light of other statutory concerns. These concerns include reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public, and effectively providing the defendant with needed educational or vocational training and medical care. 18 USC § 3553(a). Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentencing disparities among defendants with

---

[1] As set forth more fully below, Tidwell agrees with U.S. Probation that his offense level should be 2 levels lower than as set forth in the plea agreement by operation of USSG § 4C1.1, which was not in effect at the time the parties negotiated the terms of the plea agreement.

similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. *Id.*[2]

The sentencing court must compute the guidelines, which are the "starting point and the initial benchmark," but which may not be presumed reasonable. *Gall v. United States*, 552 U.S. 38, 49-51 (2007). Then, the court considers the parties' arguments, after which it makes an "individualized assessment based on the facts presented," considering all of the factors under 18 USC § 3553(a). *Id.* Ultimately, the sentencing judge must select a sentence within the statutory range that is "sufficient, but not greater than necessary" to satisfy the varied purposes of punishment identified by Congress. 18 USC § 3553(a); *see also* 18 USC § 3553(a)(1)-(2).

The First Circuit has summarized the central principles of the post-*Booker* and -*Gall* sentencing procedure described above:

> This sequencing necessitates a case-by-case approach, the hallmark of which is flexibility. In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court "should consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*United States v. Martin,* 520 F.3d 87, 91 (1st Cir. 2008) (quoting *Gall*, 552 U.S. at 52).

## II.   Advisory Sentencing Guidelines Calculation

Tidwell agrees with U.S. Probation's calculation of his sentencing guideline range, as set

---

[2] Under *Booker,* this Court may consider certain factors that are rejected or ignored by the guidelines. Sentencing courts previously were forbidden from considering, *inter alia*, a defendant's history and characteristics to the extent that they involved his mental and emotional condition, USSG § 5H1.3; her education and vocational skills, *id.* at § 5H1.2; drug or alcohol dependence, *id.* at § 5H1.2; socioeconomic status, *id.* at § 5H1.10; or lack of guidance as a youth, *id.* at § 5H1.12. These factors can now support a sentence outside the guidelines.

forth in paragraphs 53-73 of the Presentence Report ("PSR"), as follows. Counts 2 (false statements to a bank) and 3 (identity theft) are grouped, pursuant to USSG § 3D1.2(d); Count 1 (receipt of payments in violation of official duties) does not group with Counts 2 and 3, and will comprise its own group. Count 1 will form Group 1; Counts 2 and 3[3] will form Group 2. The following table contains the numerical calculation of Tidwell's Total Offense Level and the corresponding guidelines sentencing range:

| **Group 1 – Count 1** | |
|---|---|
| Base Offense Level – § 2C1.1(a)(1) (Public Official) | 14 |
| Loss – §§ 2C1.1(b)(2); 2B1.1(b)(1)(D) ($40,000-$95,000) | +6 |
| Offense Level | 20 |
| **Group 2 – Count 3** | |
| Base Offense Level – § 2B1.1(a)(1) | 7 |
| Fraudulent Use of ID – § 2B1.1(b)(11)(C)(i) | +5 |
| Offense Level | 12 |
| **Multiple Count Adjustment** | |
| Group 1 (Group with highest offense level) – § 3D1.4(a) | 1.0 Unit |
| Group 2 (5-8 levels less serious than Group 1) – § 3D1.4(b) | .5 Unit |
| Total Units | 1.5 Units |
| Adjustment – § 3D1.4 (Table) | +1 level |
| **Combined Offense Level** | 21 |
| **Additional Adjustments** | |
| Acceptance of Responsibility – § 3E1.1(b) | -2 |
| Timely Notification of Guilty Plea – § 3E1.1(a) | -1 |
| Zero-Point Offender – § 4C1.1 | -2 |
| **Total Offense Level** | 16 |
| **Criminal History Category** | I |
| **Guideline Sentencing Range** | 21-27 months |

---

[3] Since Counts 2 and 3 are grouped pursuant to USSG § 3D1.2(d) and "involve offenses of the same general type to which different guidelines apply," the offense within the group that produces the highest offense level (Count 3) is to be used to determine the offense level of the group. *See* USSG § 3D1.3(b).

III. **The Requested Sentence Is Sufficient, But Not Greater Than Necessary, To Comply With The Statutory Purposes Set Forth In Under the Sentencing Reform Act**

After determining the guideline range, this Court must consider whether the statutory factors warrant an ultimate sentence above or below the guideline range. *United States v. Jiménez-Beltre,* 440 F.3d 514, 518-19 (1st Cir. 2006). The Supreme Court has emphasized that section 3553(a) is "more than a laundry list of discrete sentencing factors; rather, it is a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Rodríguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough,* 552 U.S. at 101). That tenet – the "parsimony principle" – instructs "district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.* (quoting 18 U.S.C. § 3553(a)).

A. <u>Defendant's Background and Circumstances Leading Up to the Offense Conduct</u>

Tidwell's early and formative years were anything but idyllic. From an early age, while living with his mother, father, and older brother in Tallahassee, FL and Atlanta, GA, he was eyewitness to multiple instances of domestic abuse and violence perpetuated by his father against his mother and his older brother. He not only recalls his mother being treated at a local hospital because of this on at least two occasions, but also accompanying her for treatment because he was too young to be left behind (and presumably deemed too vulnerable by his mother to be left with his father). According to the defendant's recall, his mother's injuries over time included her having a "tooth knocked out", broken ribs, and a lacerated liver.

As already noted, the physical abuse was not limited to his mother. Tidwell recalls that when his older brother was either 15 or 16 years old, his father beat him so severely with a belt that when he dressed for P.E.at his local high school, he was bruised so badly that school authorities reported his father to the police. Tidwell, who witnessed this beating, does not recall subsequent

5

police intervention. While Tidwell reports no history of mental health issues or treatment, the traumatic impact on any child-witness to household violence cannot be understated; nor can its effects be discounted.

While Tidwell was not himself subjected to physical abuse and beatings by his father, he reports that his father belittled him constantly, calling him "weak"; "too skinny"; and "just like [his] mother", which assuredly contributed to youthful feelings of low self-esteem and minimal "worth". It likely came as a mixed blessing when his father (who also engaged in a pattern of infidelity) abandoned him and his mother for another woman when the defendant was nine years old. On the one hand, his home was finally violence-free. On the other, he literally no longer had a permanent home because, after abandoning his family, his father allowed their Atlanta home to go into foreclosure, precipitating a lengthy period of homelessness and rootlessness that would be both inimical, and a hinderance, to healthy individual growth and development during ones formative years for even the most resilient child, especially in terms of fostering social and emotional attachments, inspiring personal stability, and encouraging engagement and commitment. While these developmental deficiencies can only be presumed[4], the reality Tidwell attending four (4) different middle schools and five (5) different high schools[5] because of his and

---

[4] While devoted to his wife, their union is Tidwell's third marriage.

[5] After their home was foreclosed, Tidwell and his mother first moved in with his grandmother in Atlanta, where he was able to attend his same middle school. He attended a new middle school when he and his mother next moved into an apartment, and subsequently in with his aunt, in Lake City/Morrow, GA. He attended his third middle-school when his mother and he moved to Rex, GA to live with his new stepfather. He completed his middle-school (his fourth) and started H.S. when he, his mother, and stepfather subsequently moved to Stockbridge, GA. His high school years followed a similar Odyssey. After starting high school in Stockbridge, he next attended Wilson H.S. in Jacksonville, when he, his mom, and his stepdad again relocated, this time to FL. He then transferred to Mandarin H.S. in Jacksonville, where he remained for a year. Upon moving in with his brother back in Atlanta, he attended his fourth high school (Morrow H.S.), and then obtained

his mother's homelessness, and his and her financial precariousness, must not only be considered in the context of relevant 3553a factors, but is the reason Tidwell never enjoyed the universal feeling of success, accomplishment, and likely triumph, which most teens experience when finally graduating from a traditional high school; instead, having moved so many times that his hours and course credits were lost or discounted, he ultimately obtained his H.S. diploma while attending Florida Community College (FCC) in Jacksonville.

While Tidwell credits his (now deceased) mother with doing the best she could to raise and sustain him despite extreme family dysfunction and financial difficulties and admits to developing a close bond with her because of their shared adversities, his relationship with her was also not without acrimony. Indeed, Tidwell reports that his withdrawal from Mandarin H.S., and him moving back alone to Atlanta and in with his older brother, as well as his re-enrollment in H.S. there, was because of his mother's increased alcohol dependency and excessive drinking and, according to the defendant, "me acting out". That such issues would have eventually manifested in each is not surprising. In contrast, what is surprising is that Tidwell was ultimately able to obtain an H.S. degree and, in the process, develop a strong and lasting work-ethic, notwithstanding.

Tidwell reports consistently working throughout high school at temporary jobs such as TJ Maxx and pizza delivery services. He contributed some of these wages towards overall household support. While attending FCC, he started his own landscaping business which he maintained for a decade until being hired by the Bureau of Prisons (BOP) as a corrections officer (CO) at FCI Forrest City in Arkansas in 2000. After two years, he was transferred internally to work in the Facilities (maintenance) unit at Forrest City, where he remained until promoted internally and

---

his H.S. diploma (as opposed to a GED) when he returned to Jacksonville and attended the local community college.

moved within the BOP to FCI Devens in 2008. Upon his arrival at Devens, he assumed a Supervisory position as General Foreman within the Facilities Unit there and effectively served as assistant facilities manager with general building and grounds maintenance responsibilities, which included overseeing a maintenance staff of 26 BOP personnel, who in turn supervised on-grounds inmate work details.

Tidwell remained in this supervisory position until being demoted for hanging a sign that was deemed offensive in 2016 and reassigned "inside-the-walls" as a Correctional Counselor for Units N (mental health) and P (hospital), collectively described as N & P, where he worked until his suspension for the instant offense conduct.

Notwithstanding his lapse in judgement regarding signage, Tidwell's 23 yrs. tenure with the BOP was not without merit and distinction. In 2000, he received the Honor Grad Award for graduating "top" in his class in testing results and firearms proficiency at the Glynco Federal Law Enforcement Training Center (FLEFTC), in Brunswick, GA. In 2004, he was honored as Employee of the Year at FCI Forrest City for his work and dedication as Landscape Supervisor. He also received a number of BOP Special Acts Awards, to include finding $9,000 cash and marijuana in an inmate's cell, which he collected and turned over to the Special Investigations Unit; locating and confiscating contraband cellphones; as well as controlled substances; and reporting a fellow-staff member at FCI-Devens whom he discovered injecting heroin within the facility; the related "works" which he personally recovered from the restroom where he had observed the staff-member using them, and immediately turned-in to the Duty Lieutenant.

B.  Offense and Post-Offense Conduct

Tidwell has admitted his guilt and accepts full responsibility for his actions. In this, he does not equivocate, nor does he seek to excuse. He does, however, desire to provide the following

information which he believes to give relevant context for this Honorable Court's consideration of his offense conduct.

When the government shutdown in 2018, Tidwell's continued work as a Correctional Counselor in the N & P unit was deemed "necessary" ("essential"). As such, he was required to continue to work without real time salary. At the time, he was helping support both his biological son and biological daughter, who were each attending Valdosta State College in Georgia. Between helping with his daughter's tuition[6], and paying for his son's automobile, car insurance, and cell phones (his ex-wife was providing no support to either child), Tidwell was stretched so thin, he wasn't sure he could pay his own bills, eat, and/or pay rent to keep a roof over his own head, with no salary "coming in". In desperation, he took a second night-job working Security at Striptease-Club in Worcester. While the salary began to help ease his financial circumstances, the hours were brutal. Often with close-up and related premise "policing" responsibilities, he wasn't out of the Club before 3:30AM. With his normal shift requiring him to report at Devens at 6AM, the two hours or less sleep-schedule he was maintaining became untenable.

The 2018 shutdown continued a full eight weeks[7]. A seemingly reasonable alternative presented itself to the impracticality of the second job which he continued to work-at to "make ends meet" even after the shutdown ended, when, in 2019, he was offered the opportunity to work at property management by Individual 2. The offer involved management/supervision of 12 rental properties in Worcester, to include repairing what was broken: dishwashers, microwaves,

---

[6] Tidwell was granted full custody of his daughter in 2013, when she was still under-age. She left her mother in GA to move in with him when he was residing in Nashua, NH. She lived with him there, through her H.S. graduation, before moving back to GA to attend college. Even now, Tidwell is still helping her pay off her Sally Mae (student loan) payments.

[7] As did all BOP employees, Tidwell received his back-salary after the shutdown ended.

plumbing, sewage backups, washing machines, H-VAC units. The job also included drafting/executing leading agreements, painting, and cleaning apartment units after move-outs, and showing apartments to prospective renters. While Tidwell does take issue with the government's suggestion that he was wholly unqualified for the job---he had nearly two decades experience with the BOP as a facilities/maintenance supervisor and another ten years before that as a self-employed landscaper---he admits the arrangement was inappropriate (i.e., criminal) and contrary to BOP policy. At the time he justified his actions in that the job was one he really did work ---he took his responsibilities seriously and attended them with diligence; also, it was one with duties he felt he was qualified and had the experience to perform. Moreover, this was a job he could perform during reasonable nighttime hours, on weekends, days off, and holidays. Additionally, it provided him with housing, which also helped relieve his over-stretched finances.

Tidwell knows this relationship was not at arms-length. He admits it was wrong and criminal, and that he should not have pursued it; just as he knows he should not have accepted the college loan assistance for his daughter, no matter how desperate he may have been to keep up with tuition payments. He was fully aware of Individual 2s relationship to Individual 1 and knew that his care custodial duties regarding individual 1 absolutely precluded, indeed forbade, any financial exchange or arrangement/transactions with either. Because of this, he has voluntarily pleaded guilty to all charged counts in the information and accepts full and complete responsibility for the wrongfulness of his conduct. He now places himself at the Mercy of this Honorable Court.

C. <u>Circumstances Affecting Relative Culpability</u>

According to US Probation, judiciary sentencing information (JSIN) indicates eleven (11) federal defendants whose primary guideline was §2C1.1, and who like the defendant also had a

Criminal History category of I and a total offense level of 16, were sentenced between FY2018-2022. Of those in this cohort who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was fifteen (15) months. While each case stands on its own facts and merits, it is respectfully submitted that Tidwell's acknowledged conduct herein neither persuades nor encourages the nine (9) months sentencing increase above this national average urged by the government; the need to avoid unwarranted sentencing disparities militates against it.

Moreover, Tidwell's status as a former Correctional Counselor for the BOP is synonymous with being a former Federal Corrections Officer (CO). Indeed, whether in facilities/maintenance, or as a counselor, Tidwell has always been classified as a C.O. for GSA employment purposes. As such, the risk of him being subjected to unwarranted harassment, intimidation, and possible physical violence from other inmates, as well as from corrections personnel, is real even in a presumed low security setting. Because of this, any "federal time" he does serve will likely feel to him like "hard time" and could necessitate him serving the entirety of any incarceration in Protective Custody[8] . In other words, Tidwell will not be an "average" white collar inmate because the quality of any time he does serve will likely be anything but average; imposing the average sentence for individuals in CHC I (i.e., 15 months) with primary a guideline of §2C1.1 on this

---

[8] In or about 2001, Tidwell was assaulted by a Mexican Drug Cartel member when he discovered, and attempted to confiscate, home-brew from his cell at FCI Forrest City. After numerous controlled substances were recovered because of related cell shakedowns executed by prison personnel in the same unit, a further gang assault against the defendant was planned in retaliation. That plot was uncovered, and prevented from happening, by the Compound Officer. Nonetheless, Tidwell was reposted outside and reassigned to "truck patrol" for three months until the threat to his personal safety had been deemed to have abated sufficiently enough for him to return to inside-the-walls duty. Throughout his 23 yrs. with the BOP, he has also assisted in investigations that resulted in certain inmates serving longer sentences.

defendant may result in a far more difficult term of incarceration than can be expected for, or is experienced by, those in his same cohort. [9]

### D. Proposed Disposition & Justification

Tidwell's acceptance of responsibility is genuine and sincere. He voluntarily pled guilty knowing the government seeks to jail him, the BOP will (and has) terminated him, and some, if not all, of his pension will be forfeited. Moreover, by waiving his right to indictment by the Grand Jury and pleading guilty to an information, he didn't just spare the government the time and expense of a jury trial and trial preparation, but also the associated costs of a protracted grand jury investigation. With this as the procedural backdrop, Tidwell respectfully requests he not simply be judged by the two (2) years of misconduct that resulted in the criminal charges to which he has pleaded guilty, but against the full canvass of his twenty-three (23) years of government service in sometimes dangerous and often stressful settings; service in which he consistently did the "right thing" and made correct decisions---indeed commendable decisions---during the execution of his official duties, even when risking his own personal safety. It is respectfully submitted that these things too, along with his "hardscrabble" and traumatic childhood, his life-long dedication to hard work, and the substance and contents of letters of support (submitted in support hereof) from a dozen or so individuals who know him well attesting to his good works and fine character provide

---

[9] While acknowledging the different nature of the underlying conduct, for sentencing purposes, it is important to note that in July 2023, in *United States v. Seth Bourget*, no. 1:20-cr-10029, the Honorable Denise J. Casper sentenced the defendant in that case, a former CO at the BOP same facility where Tidwell committed the crime (s) to which he has admitted, to serve 12 months and 1 day as a result of his conviction for deprivation of rights under color of law under 18 USC § 242 for use of excessive force on a mentally disabled inmate that resulted in serious physical injury. Clearly each case stands on its own merits, but it is difficult to numerically reconcile the government's request herein, which is 2x greater than that which they requested, and the defendant received, in *Bourget*.

substantial mitigation to help offset the harm caused by the criminal conduct in which he engaged for a short period of his otherwise unblemished fifty years of life.[10] That this misconduct was committed in the context of him becoming the primary source of financial support for his two children after his divorce from their mother, as well as the increased stress (within an already stressful job), anxiety, and uncertainty that came with being deprived of his government salary during the eight (8) weeks government shutdown for which he bore no responsibility, does not excuse his crimes. It does help explain them.

Tidwell is now a lifelong felon, forfeiting certain rights and privileges to which he was previously entitled. He also carries the stigma of having dishonored a job he embraced and loved. Having accepted such opprobrium when taking full and complete responsibility for what he has done, he humbly asks that the Court impose a sentence that is sufficient but not greater than necessary to address the specific wrong(s) he has committed and neither accept, nor exceed, the government's recommended period of incarceration and the substantial fine(s) they are nonetheless seeking in the absence any claimed financial loss resulting from his wrongdoing.

---

[10] Rather than providing a basis for the substantial fine(s) being sought by the government, the fact that Tidwell has owned and operated a package delivery service that employs nearly eighty (80) personnel in the somewhat economically depressed area of Keene, NH since the date of his suspension, pending investigation, by the BOP , is not only a positive reflection on Tidwell's resiliency and work ethic but moderately informs his request for a below guidelines sentence in that a lengthy/excessive sentence, if imposed herein, will not only require the closing of his business but will also directly impact the large number of families so employed by his company. In pointing this out, the defendant does not dispute the BOP's caution against outside employment in its Standards Manual. However, he directs the government's attention to the actual policy statement itself (as set forth in the information to which he pled guilty as well as the statement of facts they submitted to US Probation) which states "an employee may not engage in outside employment that conflicts with his/her duties". Not only does that statement _not_ preclude outside employment, but the caveat would not seem to apply to any person under suspension and thereby prohibited from performing "his/her duties."

13

## CONCLUSION

Mr. Tidwell respectfully requests this Honorable Court impose a sentence of six (6) months incarceration---with a self-reporting date in 42 days--- to be followed by 2yrs Supervised Release, a $10,000 fine, and a $300 special assessment.

Dated: May 3, 2024                     Respectfully submitted,
                                       William S. Tidwell
                                       By and through his attorney,


                                        /s/ *R. Bradford Bailey*
                                       R. Bradford Bailey, BBO#549749
                                       BRAD BAILEY LAW, P.C.
                                       44 School Street, Suite 1000B
                                       Boston, Massachusetts 02108
                                       Tel.: (781) 589-2828
                                       Fax: (857) 265-3184
                                       dan@bradbaileylaw.com


### Certificate of Service

I, R. Bradford Bailey, hereby certify that on this the 3d of May 2024, I caused a true copy of the foregoing *Memorandum in Aid of Sentencing* to be served upon all necessary parties to this matter by virtue of electronically filing the same via the CM/ECF system.

                                        /s/ *R. Bradford Bailey*
                                       R. Bradford Bailey