UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WILLIAM S. TIDWELL | No. 23-10193-WGY |

**SENTENCING MEMORANDUM OF THE UNITED STATES**

The defendant, William "Stan" Tidwell, faces sentencing for three felonies: (1) receipt of improper payments by a public official in violation of his official duties; (2) false statements to a bank; and (3) identity theft.  Tidwell committed these crimes—each of which is generally viewed as a crime of moral turpitude—while he was a public servant who held a position of trust as a Correctional Counselor at the Federal Bureau of Prisons.

The core conduct that should drive Tidwell's sentence—receiving over $90,000 in improper benefits as part of a corrupt arrangement with a wealthy inmate under his care and custody—strikes at the core mission of the Federal Bureau of Prisons and our correctional system of justice at large.  When put in a position of trust and power over federal inmates, Tidwell abused his position for private gain in a manner that would make an objective observer question whether people in our justice system are treated fairly and equitably.  He then committed other crimes to remove any doubt that his corruption was not a one-off lapse in judgment.

Tidwell's corruption, fraud, and theft call for a meaningful sentence that reflects the seriousness of his crimes, promotes respect for the law, provides just punishment, and affords adequate deterrence to others who may be tempted to abuse their position of trust to engage in bribery, fraud, or theft.

For the reasons below and those to be articulated at the sentencing hearing, the Court should sentence Tidwell to two years (24 months) in custody, three years (36 months) of supervised release, forfeiture of $95,058.31, a fine of $10,000, and a special assessment of $300.

## I.  **The Plea Agreement**

Consistent with section 4 of the Plea Agreement between the parties, the government recommends a sentence of 24 months in custody, 36 months of supervised release, forfeiture, and a fine at the low end of the guidelines sentencing range.  Before turning to a discussion of the 18 U.S.C. § 3553(a) factors, it is worth highlighting a couple of aspects of the Plea Agreement that hopefully convey to the court that the government's position in this case has been measured:

*First*, as expressly stated in the Plea Agreement, § 1, the government agreed not to charge Tidwell's spouse for violating or aiding and abetting the violations listed in counts 2 and 3.  As the presentence report mentions, *see* PSR, ¶ 47, Tidwell enlisted the help of his then-fiancé and now-wife to commit his identity theft and false statement schemes.  Among other things, Tidwell enlisted his wife's assistance to create the forgeries of the "gift letters" he submitted to the bank when stealing Individual 2's identity and making false statements to the bank.  *Id.*  Tidwell's wife, of course, would also have benefited from that scheme given that a core purpose of the scheme was to help Tidwell and his wife finance and purchase a house they would live in together.  The decision not to charge Tidwell's wife for her role was an express benefit provided in the Plea Agreement.

*Second*, the Plea Agreement and Information reflect a resolution to an identity theft charge under 18 U.S.C. § 1028, as opposed to an *aggravated* identity theft charge under 18 U.S.C. § 1028A, which would have carried a mandatory minimum sentence of 2

years in custody consecutive to the sentence on other counts. *See* 18 U.S.C. § 1028A ("Whoever, during and in relation to any [enumerated felony], knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment for such felony, be sentenced to a term of imprisonment of 2 years."). Tidwell's use of Individual 2's name, business information, and signature could arguably have been the basis of a different charge with stiffer penalties. The government did not pursue such a charge, and the government mentions it here only to suggest that this is not a case where the government is simply seeking the maximum penalty it can—to the contrary, the government's position has been measured and is narrowly tailored to be no greater than necessary to effectuate the sentencing purposes outlined in 18 U.S.C. § 3553(a).

*Third*, under the Plea Agreement, the government agreed to recommend a fine at the low end of the guideline range. At the time of the Plea Agreement, the government was not in possession of information recently provided that the defendant has been running a business that allowed him to make hundreds of thousands of dollars (in circumstances where he was ostensibly double-dipping by receiving pay from the Bureau of Prisons while he was suspended and under investigation, but during which time he pursued outside employment without approval from the Bureau of Prisons). The guideline fine range as calculated in the PSR is $10,000 to $1,000,000. PSR, ¶ 115. The government stands by the Plea Agreement and seeks a fine of $10,000 here, but notes these facts only to suggest that this is another area where the concessions made in the Plea Agreement are already inuring to the defendant's benefit.

## II.  **The Nature and Circumstances of the Crimes and the Need to Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence All Support the Government's Recommendation.**

The nature and circumstances of Tidwell's crimes; the need to promote respect for the law, provide just punishment, and afford adequate deterrence; and the other sentencing factors articulated in 18 U.S.C. § 3553(a) strongly support the government's recommendation of 2 years in custody.

The Court should view Tidwell's core conduct for what it was—a person in a position of public trust taking significant amounts of improper payments from a wealthy individual in his care under corrupt and highly troubling circumstances. The section of the United States Code that Tidwell stands convicted of violating in count 1—18 U.S.C. § 201—is titled "bribery of public officials," and that is essentially what this was.

To understand why bribery or corruption by a Bureau of Prisons (BOP) employee like Tidwell is so damaging, it is important to understand both the BOP's mission as well as the critical role that a Correctional Counselor like Tidwell plays in the day-to-day operations of the BOP.

The core mission of the BOP is to provide for the care and custody of federal inmates. "Given the role of the BOP and its employees in caring for inmates and providing for safety at correctional facilities," the BOP has numerous rules and regulations in place to govern the duties and conduct of its employees. PSR, ¶ 14; *see also* PSR, ¶ 13 (stating how the "BOP Standards Manual" builds on federal regulations regarding ethics and conflicts of interest, including 5 C.F.R. Part 2635).

The BOP standards and ethical rules that Tidwell violated when he took multiple payments across multiple months from an inmate are almost too many to list:

- "Employees must ... endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards promulgated in this policy and the statutes." PSR, ¶ 14.

- "Employees must ... avoid conflicts of interest in matters that affect their financial interests." *Id.*

- "Employees may not allow themselves to show partiality toward, or become...financially involved with inmates, former inmates, or persons known (or who should have been known based on circumstances) to the employee as a family member or close friend of inmates or former inmates." *Id.* at ¶ 15.

- "An employee may not offer or give to an inmate or a former inmate or any member of his/her family, or to any person known to be associated with an inmate or former inmate, any article, favor, or service that is not authorized in the performance of the employee's duties." *Id.* at ¶ 16.

- "Neither shall an employee accept any gift, personal service, or favor from an inmate or former inmate, or from anyone known to be associated with or related to an inmate or former inmate." *Id.*

- "An employee may not show favoritism or give preferential treatment to one inmate, or a group of inmates, over another." *Id.*

- "An employee may not engage in outside employment ... that conflicts with his/her duties." *Id.* at ¶ 17.

Tidwell's receipt of a stream of benefits from a wealthy inmate were not a one-off mistake or merely some technical violation of the rules. It was a damning betrayal of the trust put in him by the BOP and society at large. And it was corruption by someone who played arguably the most important role in the day-to-day life of the inmates assigned to him. *See* PSR, ¶ 19 (describing Tidwell's major duties and responsibilities). "Tidwell dealt with inmates on a daily basis and had a significant impact on the day-to-day activities of inmates. Among other things, Tidwell had a significant role in monitoring and changing

work assignments, monitoring and changing housing assignments, arranging legal calls, and coordinating prison visits for inmates." PSR, ¶ 20.

The harm caused by Tidwell was magnified because he took a stream of benefits from "Individual 1, an ultra-high net worth individual serving time in federal custody for committing crimes in another jurisdiction. For years, individual 1 has been publicly described as a billionaire. Individual 1's background and financial status was generally known to not only Tidwell, but also other inmates and employees at FMC Devens." PSR, ¶ 21. When viewed through that prism, the nature and circumstances of Tidwell's corruption become even more troubling. Tidwell played a critical role in the day-to-day lives of inmates, and other employees and inmates knew that one of the inmates under Tidwell's care was a person of Individual 1's net worth and stature—our justice system essentially asks inmates to have faith that a person in Tidwell's position of power and trust is not treating the billionaire better than they are being treated.

Here, it is striking that even without knowing that Tidwell had a wildly inappropriate relationship with an inmate and was taking tens of thousands of dollars from Individual 1, other employees at the BOP had begun questioning why Tidwell was treating Individual 1 in certain ways. For example, in October and November 2018, when Tidwell was most likely orchestrating the scheme with Individual 1 to receive the $25,000 payment, there were multiple concerns raised about why Tidwell was not returning Individual 1 from much desirable "P unit" to the general "J unit." *See* PSR, ¶¶ 31, 32 (summarizing multiple emails from BOP staff to Tidwell asking why Individual 1 had not been moved out to the P unit despite medical clearance, and summarizing evidence strongly suggesting that the $25,000 payment was designed to influence Tidwell into assisting Individual 1 receive favorable housing or other preferences).

6

As another example, inmates at FMC Devens are usually required to have jobs at the facility (e.g., cleaning duties, etc.), and as the Correctional Counselor, Tidwell had the primary responsibility for assigning and monitoring inmate work details. PSR, ¶ 41. On November 19, 2018—mere weeks after Tidwell had received $25,000 from Individual 1 via Individual 2—a Correctional Officer at FMC Devens sent Tidwell an email complaining about Individual 1: "Hey Tidwell. I know [Individual 1] is an orderly but he doesnt do ANYTHING! He gets escorted by [another inmate] to the TV room where they watch TV then leave together, or just watch TV all morning. Its annoying really. Figured id let you know what happens where with that situation." *Id*. Again, Tidwell's supervision of Individual 1 was noticeable and troubling to others at FMC Devens even without them knowing that Tidwell had been secretly taking tens of thousands of dollars in improper payments from this same inmate.

The series of payments relating to the "property management agreement" between Tidwell and Individual 1 was similarly problematic in terms of both violating the letter of the law and raising concerns about Tidwell showing favoritism to Individual 1. As summarized in the PSR,

> In addition to not moving Individual 1 from the coveted P Unit at the earliest time that Individual 1 was eligible to be transferred from P Unit, Tidwell allowed Individual 1 to set up legal calls more easily than Tidwell appears to have required of other inmates. For example, on March 7, 2019, at 7:42 am, Tidwell wrote an email to Individual 1's attorney, stating: "I understand you are requesting a legal call today at 10. Can you please send me an official e-mail request for my records? CYA!" When the lawyer wrote back that his cell phone had died but he was at a hotel, the parties discussed whether Tidwell could just set up the call from his office to the attorney's hotel room, or could alternatively have Tidwell set up the call with Individual 2 (who by that point was known by Tidwell to not be any type of legal counselor, but a personal associate of Individual 1, given that Tidwell had already worked with Individual 2 to receive $25,000 that Individual 1 wanted to direct to Tidwell). This type of accommodating nature by Tidwell when setting up "legal calls" was not necessarily apparent when Tidwell was dealing with

other inmates.  As a contrasting example, on April 15, 2019 at 11:54 am, a legal assistant from the Federal Defender's Office in South Carolina wrote Tidwell trying to set up a legal call with an inmate as soon as possible and hoping it could be set up for later that day.  Tidwell responded at 12:40 pm: "Unless there is an emergency hearing, we require a minimum 72-hour notice. I can schedule a call Thursday, April 18, at 1:00 PM."

PSR, ¶ 39.

In a similar vein, "[s]eparately, the evidence raised significant concerns about whether Tidwell was appropriately monitoring Individual 1's calls and emails.  For example, in the one-year period between July 2019 and July 2020, it appears that Individual 1 sent or received 24,490 emails at FMC Devens, a number that appears to be highly atypical.  Given that a Correctional Counselor's duties include playing a leading role in all segments of unit programming, Individual 1 should have been more closely monitored by Tidwell."  PSR, ¶ 40.

These deeply concerning facts cannot be viewed in a vacuum—this was the other side of a corrupt arrangement where Tidwell had received from Individual 1 (via Individual 1's direction and/or through Individual 2):

- An $8,000 wire transfer to Tidwell's daughter on November 29, 2018 (PSR, ¶ 28);

- A $17,000 transfer wire transfer to Tidwell's daughter on November 30, 2018 (PSR, ¶ 28);

- Payments totaling $47,058.31 between June 2019 and October 2020 as management fees based on a purported 50-50 real-estate deal with Individual 1 (PSR, ¶¶ 34-36); and

- The opportunity to live at a property owned by a corporate entity controlled by Individual 1 for 15 months, without making any out-of-pocket payments, resulting in at least another $18,000 in benefits given the stated monthly rent of $1,200 (PSR, ¶ 37).

In total, Tidwell received at least $90,058.31 in improper payments or benefits from Individual 1 (or a person closely related to Individual 1).  Put differently, Tidwell, as a

public official, was *taking money from, working a side-job for, and staying at a property ostensibly owned by the inmate he was in charge of supervising*.

Even without more, the dynamic above calls for a meaningful period of incarceration and supports the two-year sentence being recommended. Here, of course, Tidwell's crimes did not stop once Individual 1 was released from custody. In 2020, after Individual 1 was released from custody, Tidwell asked Individual 2 for a $50,000 loan to finance the sale of his new home. PSR, ¶ 44. This, standing alone, was also prohibited conduct. *See, e.g.*, PSR, ¶ 15 (summarizing regulations that prohibit employees from becoming "financially involved with inmates, *former inmates*, or persons known to the employee as a family member or close friend of inmates or *former inmates*") (emphasis added). The BOP has a compelling interest in making sure correctional officers do not enter into financial dealings with former inmates given the obvious conflict-of-interest and motivations that would exist for disparate treatment when the inmate is still under the care and custody of the BOP.

Tidwell did not stop there either. When the bank sought clarification as to the source of the $50,000 that was ostensibly going to be used as a downpayment to finance the house, Tidwell falsely told the bank that this money was a "gift" from his "employer," and Tidwell made multiple material and false misrepresentations to the bank. PSR, ¶ 44.

When the bank sought written proof of Tidwell's claim that he received a $50,000 gift from his employer to purchase a new home, Tidwell continued his crime spree by turning Individual 2 from a co-conspirator in his corruption scheme to a victim in his bank fraud scheme by misappropriating Individual 2's name and signature, stealing her identity, and forging multiple documents in her name to make false statements to the bank about the source of the payments. PSR, ¶¶ 45-46. This separate scheme further

provides an insight into Tidwell's nature, shows his lack of respect for the law, shows the need for just punishment and a significant sentence, and demonstrates the need for deterrence on both a specific and general level.

### III.   The History and Characteristics of the Defendant Further Support the Government's Recommendation.

As stated above, the 18 U.S.C. §3553(a) factors—certainly when viewed as a collective—strongly support the government's recommended sentence. The government separately comments on parts of the history and characteristics of the defendant to show how this factor also supports the government's recommended sentence.

The defendant's crimes—which at their core involve a mix of corruption, fraud, and theft—are not *mitigated* by his personal history and characteristics. Tidwell, like nearly every criminal defendant that faces sentencing before this Court, undoubtedly has positive aspects to his life and career. But for purposes of sentencing, when trying to understand what Tidwell's crimes say about his personal characteristics and vice versa, the defendant's history and characteristics are not mitigating factors—if anything, the salient facts and circumstances of this case raise even greater concerns and would typically be viewed as aggravating factors.

*First*, assuming Tidwell attempts to highlight his personal and family life as a mitigating factor, the Court should view any such argument with significant skepticism. In this case, the nature and circumstances of Tidwell's crimes suggest not only a stunning betrayal of his professional obligations, but also a personal betrayal of those closest to him. Tidwell made *both his daughter and his current wife as either unwitting or knowing participants in his multiple criminal schemes*, and each of the crimes of conviction involved Tidwell using a close family member to further his crimes. As to

count 1, it was bad enough that Tidwell engaged in a corrupt scheme to receive improper payments from Individual 1, but to help get away with the scheme, Tidwell further conspired with Individuals 1 and 2 to involve his daughter in efforts to make the $25,000 payment in November 2018 appear legitimate. PSR, ¶ 26. Tidwell told his daughter that he met a man at a bar who provided scholarships to deserving students, Individual 2 then contacted Tidwell's daughter pretending to be this benefactor's secretary, and Tidwell's daughter was asked to give out her bank information for the wire transfer. PSR, ¶ 27. It is a deeply troubling and aggravating factor that Tidwell tried to involve his innocent daughter in this corrupt scheme. And as stated above, Tidwell later used his then-fiancé and current-wife to further the crimes listed in counts 2 and 3, enlisting his then-fiancé's help to forge multiple documents and make material misrepresentations to the bank. PSR, ¶ 47. Involving his close family members in his criminal schemes—either as knowing co-conspirators or unwitting participants—is not someone whose history and characteristics call for the significant downward variance that the defendant is seeking. If anything, these facts heighten the need for a just punishment.

*Second*, the length of Tidwell's misconduct is a significant aggravating factor. This is relevant to the history and character of the defendant because it shows how Tidwell had countless opportunities to reflect on his conduct and recognize the impropriety of what he was doing, but he kept doing it anyway. This was not a correctional officer who had a violent outburst or a one-off lapse in judgment or a short-in-time criminal interaction with an inmate. Tidwell, *over multiple years*, engaged in criminal activity. That fact is not only relevant to the other 3553(a) factors such as the need for the sentence to provide just punishment, show respect for the law, protect against further crimes of

the defendant, provide general deterrence, etc., but it also provides significant insight into Tidwell's history and characteristics.

*Third*, the fact that Tidwell committed multiple types of crimes are a further aggravating factor and provide further insight into his character. This was not the case of a defendant who simply chose to take money from someone he was not supposed to. Nor was it the case of a defendant who engaged in a corrupt scheme by justifying to himself the circumstances of his improper relationship with Individual 1. He essentially engaged in three separate criminal schemes, each one requiring him to make an additional and independent choice to commit another type of crime. He first engaged in a corrupt scheme to receiving improper payments from Individual 1 and 2—a scheme that required receiving payments of different types across multiple years. He could have stopped there. Nothing about his first scheme required him to commit further or additional crimes, but Tidwell chose to then make false statements to a bank. He could then have stopped there when the bank sought proof of the funds. Nothing about the initial false statements required him to commit further or additional crimes. People regularly back out of loan applications or the pursuit of a particular home for all types of reasons, but Tidwell then chose to commit identity theft and forge documents for further submission to the bank. A defendant choosing to commit three different types of crimes across multiple years is not someone whose history and characteristics are a mitigating factor.

*Fourth*, Tidwell's age should likely also be an aggravating factor—it certainly is not a mitigating factor. This Court has undoubtedly sentenced countless defendants who were young and who argued that their age or immaturity were mitigating factors. Courts also routinely hear requests for leniency from younger defendants, and defendants

increasingly argue that both social science and neurological science show that defendants "age out" of crime by their mid-20s. If Tidwell was 21 years old instead of 51 years old at the time of his sentencing, his age, information about his early and formative years, etc. might perhaps have been a potential mitigating factor. As things stand, his age, history, and characteristics are aggravating factors, if anything. He was an older, mature, long-time federal employee in a position of trust when he committed his serious crimes.

*Fifth*, Tidwell's financial situation is also a neutral factor at best, and arguably better viewed as an aggravating factor. Unlike many other people who commit crimes based on financial desperation or a perceived inability to make money lawfully, Tidwell had both a legitimate job with the BOP and separately had the ability to start or operate a very successful business. Based on documents Tidwell produced to the Probation office recently, it seems that the delivery business Tidwell started just a few years ago had a gross revenue of *$2.79 million dollars* in 2022. In terms of money-in-pocket, Tidwell appears to have received $132,438 in officer compensation that year, as well as another $21,361 in non-dividend distributions. All that *on top of* his nearly six-figure salary he was still receiving from the Bureau of Prisons. The 2023 numbers are not available, but based on the disclosures from the prior year alone, it appears that Tidwell and his wife make hundreds of thousands of dollars per year. *See generally* PSR, ¶ 102. [The government is skeptical of much of the cash flow analysis reflected in the PSR. For example, the government's financial investigation does not support a rent of $6,401 per month.] In any event, Tidwell's financial situation and personal history do not mitigate his crimes involving the bank and identity theft—to the contrary, they provide insight into someone whose crimes were not compelled by a dire financial situation with no hope for improved prospects.

*Sixth*, the government cannot help but comment on the irony and temerity of Tidwell starting a delivery business and receiving hundreds of thousands of dollars while he was still receiving his BOP salary and under federal investigation. The U.S. Attorney's Office has confirmed with the Bureau of Prisons that Tidwell was not authorized to receive money from outside employment while he was still a BOP employee. He surely was not authorized by the BOP to receive money from outside employment while he was still receiving a paycheck from the BOP without having to work because he was suspended while under federal investigation for egregious violations that included receiving money from outside employment. Put differently, part of the crime of conviction here is that Tidwell received money from outside employment (*i.e.*, his property management job with individual 2), and yet, while Tidwell was still a BOP employee subject to BOP rules, he began double-dipping by taking his BOP paycheck for years without resigning and without subjecting himself to BOP's rules, and he is now seeking leniency by pointing to that same unauthorized outside employment as a positive and mitigating factor.

Based on the government's multi-year investigation of Tidwell, his history and characteristics, especially when combined with the nature and circumstances of the crime, the need to provide just punishment, the need to promote respect for the law, and the need afford adequate deterrence, all call for the guideline sentence being recommended by the government—2 years in custody to be followed by the 3 years of supervised release.

## IV.   <u>Forfeiture is Required</u>

As stated above, *see supra* at p. 14, Tidwell received at least $90,058.31 in the stream of benefits from Individuals 1 and 2. Tidwell should not be allowed to retain the

benefits of his bribery scheme and all such proceeds should be forfeited. Tidwell appears to have returned the $50,000 loan/gift to Individual 2, so no forfeiture is needed as to that amount. Although Tidwell has apparently made hundreds of thousands of dollars in recent years from outside employment that he does not appear to have had permission to have while a BOP employee, the government does not believe the proceeds of this outside employment are necessarily forfeitable as a matter of current law. Accordingly, a forfeiture order should enter in the amount of $90,058.31.

**V.    A Fine is Appropriate**

The range of the fine appears to be $10,000 to $1,000,000. *See* PSR, ¶ 115. The government seeks a fine at the low end of the guideline range, as it indicated it would seek under the Plea Agreement. The defendant plainly appears able to pay a fine.

## CONCLUSION

For the reasons above and those to be articulated at the sentencing hearing, the government recommends that the Court sentence Tidwell to 2 years in custody, 3 years of supervised release, a forfeiture order of $90,058.31, a fine of $10,000, and a special assessment of $300.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By: */s/ Kunal Pasricha*

Kunal Pasricha
Assistant United States Attorney
District of Massachusetts

## CERTIFICATE OF SERVICE

  I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

       */s/ Kunal Pasricha*
       Kunal Pasricha
       Assistant United States Attorney